**2001 ME 103**

**George M. LASKEY**

v.

**S.D. WARREN COMPANY.**

Supreme Judicial Court of Maine.

Argued: May 15, 2001.
Decided: July 11, 2001.

342 A.2d 729, 734 (Me.1975), but is now codified at 39–A M.R.S.A. § 354 (2001).

James J. MacAdam, Esq., (orally), MacAdam McCann, South Portland, for employee.

Kevin M. Gillis, Esq., (orally), Troubh, Heisler & Piampiano, P.A., Portland, for employer.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

ALEXANDER, J.

[¶ 1] S.D. Warren Company appeals from a decision of a Hearing Officer of the Workers' Compensation Board denying its petition for review of incapacity. The key issues on appeal arise from the action of the Hearing Officer disqualifying an independent medical examiner (IME) who had examined the employee and reported on his condition.

[¶ 2] S.D. Warren contends that: (1) the employee's objection to the IME was untimely; (2) the Hearing Officer lacked authority to disqualify an IME because qualification and disqualification of IMEs is a Board function; (3) the Hearing Officer misinterpreted the conflict of interest sections of the statute which are limited to case-specific conflicts; and (4) the Hearing Officer erred in denying S.D. Warren's petition for review of incapacity. There is no error in the Hearing Officer's interpretations of law or rulings on the issues. We affirm the decision.

## I. APPOINTMENT AND CONFLICT OF INTEREST RULES

[¶ 3] The appointment and conflict of interest sections of the independent medical examiner (IME) statute, 39–A M.R.S.A. § 312 (2001), and a Workers' Compensation Board regulation governing conflicts of interest, Me. W.C.B. Rule, ch. 4, § 2(6), are important to understand both the facts and legal issues in this case.

[¶ 4] Appointment and establishment of a roster of IMEs is governed by 39–A M.R.S.A. § 312(1):

1. **Examiner system.** The board shall develop and implement an independent medical examiner system consistent with the requirements of this section. As part of this system, the board shall, in the exercise of its discretion, create, maintain and periodically validate a list of not more than 50 health care providers that it finds to be the most qualified and to be highly experienced and competent in their specific fields of expertise and in the treatment

of work-related injuries to serve as independent medical examiners from each of the health care specialties that the board finds most commonly used by injured employees. The board shall establish a fee schedule for services rendered by independent medical examiners and adopt any rules considered necessary to effectuate the purposes of this section.

39–A M.R.S.A. § 312(1) (2001).

[¶ 5] Qualifications related to conflict of interest are addressed in 39–A M.R.S.A. § 312(2) which provides, in pertinent part, that:

A physician who has examined an employee at the request of an insurance company, employer or employee in accordance with section 207[1] during the previous 52 weeks is not eligible to serve as an independent medical examiner.

39–A M.R.S.A. § 312(2) (2001).

[¶ 6] A separate sentence in section 312(2) provides that an IME will be disqualified from a particular case if the IME has treated the individual employee.[2]

[¶ 7] Under the rulemaking authority stated in section 312(1), the Workers' Compensation Board adopted Me. W.C.B. Rule, ch. 4, § 2(6) governing disclosure and conflicts of interest by IMEs. Section 2(6) states:

6. Disqualification and Disclosure in Individual Cases.

A. The independent medical examiner in a case may not be the employee's treating health care provider and may not have treated the employee with respect to the injury for which the claim is being made or benefits are being paid.

B. A physician who has examined the employee at the request of an insurance company, employer, or employee in accordance with 39–A M.R.S.A. § 207 during the previous 52 weeks is not eligible to serve as the independent medical examiner.[3]

C. The independent medical examiner must disclose potential conflicts of interest that may result from a relationship(s) with industry, insurance companies, and labor groups. A potential conflict of interest exists when the examiner, or someone in their immediate family, receives something of value from

---

1. *39–A M.R.S.A. § 207 (2001).*

2. Section 312(2), in its entirety, reads as follows:

> **2. Duties.** An independent medical examiner shall render medical findings on the medical condition of an employee and related issues as specified under this section. The independent medical examiner in a case may not be the employee's treating health care provider and may not have treated the employee with respect to the injury for which the claim is being made or the benefits are being paid. Nothing in this subsection precludes the selection of a provider authorized to receive reimbursement under section 206 to serve in the capacity of an independent medical examiner. A physician who has examined an employee at *the request of an insurance* company, employer or employee in accordance with section 207 during the previous 52 weeks is

> not eligible to serve as an independent medical examiner.
>
> 39–A M.R.S.A. § 312(2) (2001).

3. Subparagraph B of section 2(6) is virtually identical to the last sentence in 39–A M.R.S.A. § 312(2) except that in subparagraph B of the Board Rule, the phrase "the employee" is substituted for the phrase "an employee" which appears in the statute, and the phrase "the independent medical examiner" is substituted for the phrase "an independent medical examiner" which appears in the statute. Because the Hearing Officer found specific conflicts of interest in the IME's consulting and employment, under *subparagraph (C)* of the rule, we need not address this difference between the language of subparagraph B of the rule and the language of the authorizing statute. Thus, we not address the issue of whether section 312(2) creates another basis for disqualification in this case.

one of these groups in the form of an equity position, royalties, consultant-ship, funding by a research grant, or payment for some other service. If the independent medical examiner performs equivalent examinations as an employee of another organization, potential con-flicts of interest may arise from that organization's contracts with industry, insurance companies, and labor groups. The Deputy Director of Dispute Resolu-tion shall determine whether any con-flict of interest is sufficiently material as to require disqualification in the event of initial disclosure. In the event an undisclosed conflict of interest is re-vealed during the hearing process, the hearing officer may disqualify the inde-pendent medical examiner and order a new examiner which shall be assigned in accordance to this rule.

Me. W.C.B. Rule, ch. 4, § 2(6).

## II. CASE HISTORY

[¶ 8] George M. Laskey suffered a work-related injury while employed by S.D. Warren in 1984. Since then, he has re-ceived partial incapacity benefits. S.D. Warren filed a petition for review in 1998, contending that Laskey's work-related in-capacity had diminished or ended.

[¶ 9] At S.D. Warren's request, the Board appointed Stewart Russell as the IME. The IME examination took place on March 11, 1999. Dr. Russell opined that Laskey's 1984 injury had resolved and that his ongoing incapacity is unrelated to that incident.

[¶ 10] In May 1999, Laskey sent a letter to the Deputy Director of Medical/Rehabil-itation Services of the Board contending

that Dr. Russell had a conflict of interest pursuant to Me. W.C.B. Rule, ch. 4, § 2(6)(C). The Deputy Director referred the issue to the Hearing Officer.

[¶ 11] At Laskey's request, the Hearing Officer ordered a deposition of Dr. Russell pursuant to Board Rule, ch. 4, § 3(6), which provides: "Any party may set a deposition of the independent medical ex-aminer prior to the hearing or subsequent to the hearing with permission of the hear-ing officer." Me. W.C.B. Rule, ch. 4, § 3(6).

[¶ 12] Prior to the deposition, Laskey posed several questions through interroga-tories seeking information regarding Dr. Russell's industry ties and examinations in workers' compensation proceedings in the preceding fifty-two weeks. Dr. Russell re-fused to answer the interrogatories, stat-ing at his deposition that the interrogato-ries were: "a waste of my time, and I have more important things to do with my time than that, and so does my staff."

[¶ 13] Dr. Russell was deposed in Au-gust 1999. General answers given by Dr. Russell at his deposition indicated that: (i) in the fifty-two weeks prior to the exami-nation of Laskey, Dr. Russell performed, on average, between ten and twelve medi-cal examinations per week; (ii) between 90% and 95% were section 207[4] examina-tions; and (iii) 95% of those examinations were for "insurance companies, employers or defense counsel." Dr. Russell testified that he charges $850 per examination, on average, and earns roughly $240,000 per year from medical exams.[5] In addition, Dr. Russell testified that he earns roughly $90,000 per year treating employees and patients as medical director of the occupa-

---

**4.** 39–A M.R.S.A. § 207 (2001).

**5.** Taking Dr. Russell's testimony, estimating an average of ten to twelve medical exams a week, at his stated average fee of $850 per

examination, would calculate to in excess of $400,000 per year from medical examina-tions.

tional health clinic at Goodall Hospital in Sanford. Dr. Russell also testified that he has acted as a consultant to five significant southern Maine employers.

[¶ 14] Based on this record, the Hearing Officer disqualified Dr. Russell for a conflict of interest, stating the following findings and conclusions:

9. A potential conflict of interest is present when the examiner receives something of value from his/her relationship with industry, insurance companies or labor groups in the form of equity positions, royalties, consultantships or payment for other services. W.C.B., Board Chapter 4, Section 2, § 6(C).

10. Based upon the deposition of Dr. Russell, I conclude that he had several consultantships with different Employers during the 52 week period prior to the examination for which he received payment (Cyro, Merck, Fiber Materials, Woban Projects, Hussey Seeding[6].) He also was the medical director of the occupational health clinic at Goodall Hospital, treating both Employees and patients.

In addition Dr. Russell indicated that approximately, 75% of his income came from § 207 exams, approximately 90%–95% of which were requested by insurance companies, employers or defense counsel.

11. Based upon the facts noted above, particularly the percentage of work done, and moneys received, from insurance carriers, defense counsel and Employers, I conclude that Dr. Russell has a 'conflict of interest' and should not have been assigned as a § 312 examiner in this matter.

12. Board rules give the hearing officer authority to assign a new examiner. I decline to do that in this case without

some employer input. If the Employer decides it would like another § 312 exam, as opposed to a § 207 exam, it should refile its Petition and request an appointment of an examiner. . . .

[¶ 15] S.D. Warren then requested further findings directed to the timeliness of Laskey's objection and the appropriateness of focusing on general industry relationships instead of case-specific conflicts. The Hearing Officer denied the employer's motion for further findings of fact, stating:

I note that the employee's objection to Dr. Russell was made in early May, after hearing in this matter but well before the deposition of Dr. Russell. . . . I find that the facts which support the employee's objection were made available during Dr. Russell's deposition. I find that the employer had ample notice that this issue would be raised in the deposition and would be an issue in the resolution of the case. Because the factual basis for the employee's conflict objection was made available only at deposition, I find that the objection was not untimely.

. . . .

The Board's rules clearly give the hearing officer a standard to apply, in any individual case, to determine if there is an unacceptable conflict. That standard is not limited to an examination of the relationship between the parties and the § 312 doctor. The Board could have written the rule that way, but it did not. Instead, the standard chosen is broad and requires an examination of the totality of the doctor's relationships with 'industry, insurance companies and labor groups.'

The Hearing Officer referred the issue to the full Board for appellate review pursuant to 39–A M.R.S.A. § 320 (2001). Sec-

6. This may be a reference to Hussey Seating.

tion 320 authorizes full Board review of a Hearing Officer's decision which "involves an issue that is of significance to the operation of the workers' compensation system." The Board denied the request to address the issue and interpret its rule. S.D. Warren then brought this appeal pursuant to 39–A M.R.S.A. § 322 (2001).

## III. DISCUSSION

[¶ 16] There are two provisions in the Workers' Compensation Law governing medical examinations: (1) 39–A M.R.S.A. § 207 (2001) is the vehicle for ordinary, nonindependent, medical examinations for the purposes of litigation;[7] and (2) 39–A M.R.S.A. § 312 (2001) provides for independent medical examinations.[8]

[¶ 17] The IME's opinion is binding in cases when the parties agree to the selection of the IME. In cases when the parties do not agree, the Board may appoint an IME, and is required to adopt the IME's findings in the absence of clear and convincing evidence to the contrary. 39–A M.R.S.A. §§ 312(3) & (7) (2001).

[¶ 18] Because of the significance of the IME's role, independence, integrity, and absence of conflict of interest are important. Board Rule 4, § 2(6)(C) attempts to support such independence, integrity, and absence of conflict of interest. The Hearing Officer's findings regarding Dr. Russell's conflict of interest are amply supported in the record. The issue is not the findings of conflict of interest, but the process that resulted in Dr. Russell's disqualification.

[¶ 19] S.D. Warren contends that the employee's conflict of interest objection was untimely; that the objection could have, and should have, been made during the roughly two-month period subsequent to Dr. Russell's appointment and prior to the examination. S.D. Warren relies, in part, on Board Rule, ch. 4, § 2(3), which provides: "If a particular provider on the independent medical examiner list is precluded by rule or statute from acting as an independent medical examiner in the parties' case, the parties should notify the Board prior to the selection process." Me. W.C.B. Rule, ch. 4 § 2(3). In this case,

---

7. Section 207 provides, in pertinent part:

An employee being treated by a health care provider of the employee's own choice shall, after an injury and at all reasonable times during the continuance of disability if so requested by the employer, submit to an examination by a physician, surgeon, or chiropractor, authorized to practice as such under the laws of this State, to be selected and paid by the employer.... Once an employer selects a health care provider to examine an employee, the employer may not request that the employee be examined by more than one other health care provider, other than an independent medical examiner appointed pursuant to section 312, without prior approval from the employee or a hearing officer. This provision does not limit an employer's right to request that the employee be examined by a specialist upon referral by the health care provider. Once the employee is examined by a specialist,

the employer may not request that the employee be examined by a different specialist in the same specialty, other than an independent medical examiner appointed pursuant to section 312, without prior approval from the employee or the board....

. . . .

If any employee refuses or neglects to submit to any reasonable examination provided for in this Act, or in any way obstructs any such examination, or if the employee declines a service that the employer is required to provide under this Act, then such employee's rights to compensation are forfeited during the period of the infractions if the board finds that there is adequate cause to do so.
39–A M.R.S.A. § 207.

8. In addition to examinations for purposes of litigation, 39–A M.R.S.A. § 206 (2001), provides for treatment of employees for their work-related injuries.

the Hearing Officer found that the grounds for disqualification were not known until the time of the deposition. Implicit in the Hearing Officer's decision was a determination that Dr. Russell violated Me. W.C.B. Rule, ch. 4, § 2(6)(c) by failing to disclose his conflict of interest in a timely manner.

[¶ 20] Subsection 2(6) provides:

The Deputy Director of Dispute Resolution shall determine whether any conflict of interest is sufficiently material as to require disqualification in the event of initial disclosure. In the event an undisclosed conflict of interest is revealed during the hearing process, the hearing officer may disqualify the independent medical examiner and order a new examiner which shall be assigned in accordance to this rule.

Me. W.C.B. Rule, ch. 4 § 2(6)(C). This part of the rule plainly envisions the possibility of an "undisclosed conflict of interest" being "revealed during the hearing process." *Id.* The Hearing Officer did not err in determining that Laskey's objection to the IME was presented in a timely manner.

[¶ 21] On the merits of the disqualification, S.D. Warren makes two arguments. First, S.D. Warren contends that the Hearing Officer misinterpreted the Board's conflict of interest rule. Second, S.D. Warren contends that, if the Hearing Officer's interpretation of the conflict of interest rule is correct, the rule is inconsistent with the mandate of section 312 and is, therefore, invalid. S.D. Warren contends that the plain language of the conflict of interest rule permits a disqualification if the IME has a relationship with the specific employer or employee in a case, but does not permit the disqualification of IMEs based on the IME's connections with the insurance industry as a whole.

[¶ 22] Subsection 6 can be divided into its component parts. The first sentence provides:

The independent medical examiner must disclose potential conflicts of interest that may result from a relationship(s) with industry, insurance companies, and labor groups.

This sentence requires the IME to disclose relationships with "industry, insurance companies, and labor groups." Unlike other parts of the rule, this language refers to the industry at large rather than specific employers, insurers, or labor groups.

[¶ 23] The second sentence makes this reference more clear:

A potential conflict of interest exists when the examiner, or someone in their immediate family, receives something of value from one of these groups in the form of an equity position, royalties, consultantship, funding by a research grant, or payment for some other service.

Thus, a conflict of interest is defined very broadly to include the receipt of something of value from "one of these groups."

[¶ 24] The third sentence provides:

If the independent medical examiner performs equivalent examinations as an employee of another organization, potential conflicts of interest may arise from that organization's contracts with industry, insurance companies, and labor groups.

This language provides that a conflict may arise not only if the IME has a relationship with insurers, employers, or labor groups, but if the IME is an employee of *another* organization which has sufficient contacts with these groups.

[¶ 25] The last two sentences of section 2(6)(C) specify that a Hearing Officer has the authority to disqualify an IME for these general contacts with industry if

such contacts are not disclosed to the Deputy Director of Dispute Resolution and come to light during the hearing.

[¶ 26] Paragraph 2(6)(C) states that a disqualifying conflict of interest may arise from an IME's work for the insurance industry, employers, or labor unions, as a whole. It extends to Dr. Russell's consultantships with employers. We cannot say that the Hearing Officer's finding of a conflict of interest on these previously undisclosed facts was clearly erroneous.

[¶ 27] S.D. Warren also contends that even if the Hearing Officer correctly interpreted the conflict of interest rule, the rule should be invalidated because it is inconsistent with the statute. S.D. Warren relies primarily on section 312(1), which empowers the Board to create a list of fifty IMEs and to "periodically validate" that list. 39–A M.R.S.A. § 312(1). S.D. Warren contends that by disqualifying Dr. Russell based on a general relationship with the industry, the Hearing Officer has usurped the authority of the Workers' Compensation Board to determine which physicians are qualified to serve as independent examiners.

[¶ 28] The Legislature intended that the Board select and periodically evaluate whether IMEs are sufficiently independent to meet the purposes of the statute. The Board is free, however, to delegate disqualification decisions to employees of the Board. Subsection 152(7) provides: "The board has all powers as are necessary to carry out its functions under the law. The board may delegate any powers and duties as necessary." 39–A M.R.S.A. § 152(7) (2001). Separately, the final sentence of subsection 312(1) provides that: "The board shall establish a fee schedule for services rendered by independent medical examiners *and adopt any rules considered necessary to effectuate the purposes of this section.*" 39–A M.R.S.A. § 312(1) (empha-

sis added). The Board rule promoting the important objectives of independence and integrity of IMEs is within the range of authority granted by this legislation. With this statutory authority, the Board may also delegate to a Hearing Officer authority to disqualify an IME when, during the proceeding, it is established that the IME has previously undisclosed disqualifying contacts with either industry or labor, as a whole, that create a conflict of interest. Such a delegation would be appropriate "to ensure the speedy, efficient, just and inexpensive disposition of all proceedings under this Act." 39 M.R.S.A. § 152(2) (2001).

[¶ 29] The applicable Board rule provides: "In the event an undisclosed conflict of interest is revealed during the hearing process, the hearing officer may disqualify the independent medical examiner and order a new examiner [who] shall be assigned in accordance to this rule." Me. W.C.B. Rule, ch. 4, § 2(6)(C). The Hearing Officer interpreted this language as not requiring the immediate appointment of a new examiner. The Hearing Officer ruled: "Board rules give the hearing officer authority to assign a new examiner. I decline to do that in this case without some employer input. If the Employer decides it would like another § 312 exam, as opposed to a § 207 exam, it should refile its Petition and request an appointment of an examiner."

[¶ 30] S.D. Warren contends that even if the Court affirms the Hearing Officer's decision to disqualify Dr. Russell, the Hearing Officer erred in denying the petition without (1) appointing another IME, or (2) deciding the issues based on Dr. Russell's opinion as an ordinary section 207 expert. However, the Hearing Officer acted within the bounds of her authority in deferring the decision to appoint another IME and giving S.D. Warren the stated options on how it could proceed.

[¶ 31] S.D. Warren also suggests that because the employee's partial benefits are based on an average weekly wage that has been adjusted for inflation in a manner differing from our recent decision in *Bernard v. Mead Publ'g Paper Div.*, 2001 ME 15, ¶ 16, 765 A.2d 576, 581, S.D. Warren should be entitled to a new calculation of benefits without an adjustment of the employee's pre-injury wage.[9] This issue was not raised in S.D. Warren's petition for appellate review and cannot be raised now. *See Longtin v. City of Lewiston*, 1998 ME 90, ¶ 5 n. 3, 710 A.2d 901, 903 n. 3.

The entry is:

The decision of the Hearing Officer of the Workers' Compensation Board is affirmed. Remanded to the Workers' Compensation Board for further proceedings.

9. *See* P.L.2001, ch. 390 (enacting 39–A M.R.S.A. § 224 to clarify the benefit calculation issues addressed in *Bernard*).